48 So.3d 224 (2010)
In re Daniel James STANFORD and John Kevin Stockstill.
No. 2010-B-670.
Supreme Court of Louisiana.
October 19, 2010.
*226 Charles Bennett Plattsmier, G. Fred Ours, Baton Rouge, for Applicant.
John Kevin Stockstill, Lafayette, Daniel James Stanford, Eunice, Ottinger Hebert, LLC, Paul Joseph Hebert, Tammy Parker Pratt, Lafayette, for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.[*]
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondents, Daniel James Stanford and John Kevin Stockstill, attorneys licensed to practice law in Louisiana.

UNDERLYING FACTS
The formal charges arise from a 2005 case in which respondents, who shared office space at the time, were co-counsel for a criminal defendant charged in Lafayette Parish with two counts of aggravated rape.[1] If convicted of this charge, the defendant faced a mandatory sentence of life in prison. The defendant was also charged with one count each of aggravated incest, contributing to the delinquency of a minor, and indecent behavior with a juvenile. One of the victims of these alleged crimes was the defendant's sixteen-year old daughter. She was nineteen by the time the case against the defendant was set for trial on October 31, 2005. Prior to the events of October 2005, the victim had always cooperated with the prosecutor handling the case, Assistant District Attorney Michele Billeaud.
In early October 2005, Mr. Stockstill was informed by the defendant's sister (the victim's aunt) that the victim did not want to go forward with the criminal prosecution and did not want to testify against *227 her father. The aunt also indicated that the victim wanted to meet with her father.
The meeting took place at respondents' offices on October 5, 2005. At the meeting, Mr. Stanford presented the victim with three documents to sign, all of which had been drafted by Mr. Stockstill. They included an affidavit asking the district attorney's office to dismiss the criminal charges against the defendant, another affidavit stating that the victim wished to waive the "no contact" order which respondents believed was a condition of the defendant's bond,[2] and a "Confidentiality Agreement." The parties to the confidentiality agreement were the victim and the defendant. The agreement provided that all statements made during the October 5th meeting were "privileged," made "without prejudice to any party's legal position," and were "non-discoverable and inadmissible for any purpose in any legal proceeding." The agreement also provided that neither the victim nor the defendant could "be compelled to disclose or to testify in any proceedings as to information disclosed" at the October 5th meeting. Finally, the parties agreed that an injunction could be obtained to prevent disclosure of any confidential information in violation of the confidentiality agreement, and that breach of the agreement would expose the breaching party to liability for "costs, expenses, liabilities and fees, including attorney's fees, that may be incurred as a result of such breach."
Mr. Stanford testified that he made no attempt to explain the three documents to the victim before she signed them, because he was the defendant's attorney and therefore had a conflict of interest. Mr. Stanford also did not advise the victim that she could consult an attorney before signing the documents. Rather, Mr. Stanford presented each document to the victim, asked her to read it, and then asked if she understood it and was willing to sign it. The victim indicated she understood each document and signed it. After Mr. Stanford notarized the affidavits, and obtained the defendant's signature on the confidentiality agreement, the victim met privately with the defendant in a conference room at respondents' offices.
After the October 5th meeting, the victim refused to speak with Ms. Billeaud, necessitating the issuance of a subpoena for her testimony at the defendant's criminal trial. Ms. Billeaud also called Mr. Stockstill and asked for an explanation. Mr. Stockstill acknowledged that a meeting had taken place between the victim and the defendant, and on October 18, 2005, he provided Ms. Billeaud with copies of the two affidavits executed by the victim. Mr. Stockstill did not provide Ms. Billeaud with the confidentiality agreement.
Respondents then made arrangements for Lafayette attorney Chris Richard to represent the victim. Mr. Richard's fee for handling the representation was a flat fee of $2,500. Mr. Stockstill wrote Mr. Richard a check for this amount from funds provided by the defendant's father. Mr. Richard met with the victim at respondents' offices on October 25, 2005. This was Mr. Richard's first and only meeting with the victim. At that time, Mr. Richard was provided with the confidentiality agreement which the victim had signed on October 5, 2005, as well as the trial subpoena she had received. Mr. Richard could not recall seeing the two affidavits during this meeting. Reviewing the confidentiality *228 agreement and the subpoena with the victim, Mr. Richard advised her that she had to follow the law and appear for trial pursuant to the subpoena.
When the October 31st trial date arrived, neither the victim nor the defendant was present. Mr. Richard informed the judge that the victim was ill and unable to appear. Respondents advised the court that the defendant's absence was due to a medical condition which prevented him from traveling, and they requested a continuance. The court deferred ruling on the motion for continuance until November 2, 2005, and at the request of the state, issued a bench warrant for the victim. Execution of the warrant was stayed pending the victim's appearance on November 2nd. On that date, the victim appeared and the bench warrant was recalled. The court also granted respondents' motion for a continuance after receiving sufficient evidence for the defendant's nonappearance. The court then set a new trial date of March 27, 2006.
Following the court proceedings on October 31st, Ms. Billeaud met with respondents and Mr. Richard to discuss the case. At this point, respondents disclosed the existence of the confidentiality agreement and provided a copy of it to Ms. Billeaud. Respondents told Ms. Billeaud that it did not pertain to the criminal case, and that they had the victim sign the agreement strictly to protect the defendant in the event she tried to file a civil suit against him based on what he said to her in the October 5th meeting. Ms. Billeaud subsequently wrote respondents a letter, asking them to confirm this in writing; however, respondents did not respond to the letter.
At the March 27, 2006 trial date, the court was informed that a plea agreement had been reached. On March 28, 2006, the defendant pled guilty to aggravated battery, molestation of a juvenile, contributing to the delinquency of a minor, and indecent behavior with a juvenile. Pursuant to the plea agreement, he was sentenced to serve a total of twenty-two years in prison, all but six years suspended, and was placed on active, supervised probation for five years.

DISCIPLINARY PROCEEDINGS
Following its investigation of a complaint lodged by Ms. Billeaud, the ODC filed one count of formal charges against respondents, alleging their conduct as set forth above violated the following provisions of the Rules of Professional Conduct: Rules 3.4(a) (a lawyer shall not unlawfully obstruct another party's access to evidence or counsel or assist another person to do so), 3.4(c) (a lawyer shall not knowingly disobey an obligation under the rules of a tribunal), 3.4(f) (a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party), 4.1 (truthfulness in statements to others), 4.3 (dealing with unrepresented persons), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice).[3] Respondents *229 filed separate answers to the formal charges, both denying any misconduct.
This matter then proceeded to a formal hearing on the merits. The following witnesses testified in person before the hearing committee: (1) Chris Richard, (2) Michele Billeaud, (3) the victim's aunt;[4] (4) Rick Putnam, a former prosecutor in the Vermilion Parish District Attorney's Office who now practices criminal defense law; and (5) Ted Ayo, who has served for fifteen years as an ADA in Vermilion Parish. Mr. Stockstill and Mr. Stanford testified on their own behalf and on cross-examination by the ODC. Neither the defendant nor the victim testified at the hearing; the defendant is currently incarcerated and it was represented in pre-hearing pleadings that the victim could not be found or located.

Hearing Committee Report
After considering the evidence and testimony presented at the hearing, the hearing committee made factual findings, including the following:
The committee found that although the affidavit signed by the victim expressing a desire to cease prosecution of the criminal charges is common in the practice of criminal law, the "no contact" waiver signed by the victim in this case is not. Nevertheless, the committee found no misconduct by respondents in connection with the "no contact" waiver, reasoning that (1) it is not clear from the record whether a "no contact" order was actually in place, and (2) a "no contact" order usually forbids the defendant from initiating contact with the victim, and here there is no evidence that the defendant violated the order by initiating contact with his daughter.
The committee then turned to the issue of the confidentiality agreement, which it observed was highly unusual. Mr. Stockstill testified the agreement was primarily intended to protect himself from an allegation by his client of ineffective assistance of counsel, as well as to protect the two parties to the meeting against a future civil action. Mr. Stockstill denied repeatedly that the confidentiality agreement was intended to inhibit the victim from testifying in the criminal trial as to what her father, the defendant, told her in the meeting, as such an agreement would be unenforceable.
Notwithstanding this testimony by Mr. Stockstill, the committee found he intended to create an impression in the mind of the victim that she was legally barred from ever discussing the meeting on penalty of an injunction and other "liquidated damages." The committee found Mr. Stanford facilitated Mr. Stockstill's conduct by meeting with the victim and through his actions and inactions in having her execute the confidentiality agreement. The agreement was not on its face limited to a civil context, but rather applied to "any" legal proceeding. Moreover, the meaning of the confidentiality agreement was not explained to the victim by Mr. Stanford, nor was the victim advised to get an attorney before signing the document. She was also not given an opportunity to review or discuss the document with anyone prior to signing it, since it was presented immediately prior to the meeting. Following the execution of the document, the victim's attitude of cooperation changed significantly, as evidenced by the fact that she refused to meet with Ms. Billeaud in preparation for the upcoming trial. Finally, when Ms. Billeaud questioned *230 Mr. Stockstill about the victim's sudden lack of cooperation, Mr. Stockstill provided only the two affidavits, but did not provide or admit to the confidentiality agreement. This document was only provided after Ms. Billeaud pressed him further at the October 31st trial date, at which the victim did not appear, although she had been subpoenaed.
Based on these factual findings, the committee determined respondents intentionally violated Rules 3.4(a), 3.4(f), 4.1, 4.3, 8.4(a), 8.4(c), and 8.4(d) of the Rules of Professional Conduct.[5] Their conduct resulted in at least potential harm to the system of justice and to the victim. The committee determined the baseline sanction for this misconduct is disbarment.
In aggravation, the committee found the following factors: refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, and substantial experience in the practice of law (Mr. Stanford was admitted in 1993 and Mr. Stockstill was admitted in 1995). In mitigation, the committee found the following factors: absence of a prior disciplinary record, absence of a dishonest or selfish motive, and a cooperative attitude toward the disciplinary proceedings. The committee was also impressed by the numerous witnesses who testified to the good character and reputation of respondents, and it pointed out that respondents' actions were simply "a one-time, ill-considered episode."
Given the weight of these mitigating factors, the committee recommended a significant downward deviation from the baseline sanction of disbarment. The committee emphasized that respondents' conduct did not involve an exchange of money, and that there was nothing improper about the meeting between the defendant and his daughter. Under these circumstances, the committee recommended that respondents be suspended from the practice of law for six months. The committee further recommended this suspension be deferred in its entirety and that respondents attend Ethics School.
Both respondents and the ODC objected to the hearing committee's recommendation.

Disciplinary Board Recommendation
After reviewing this matter, the disciplinary board found that the hearing committee's factual findings are generally supported by the record.[6] Based on these findings, the board determined respondents violated Rules 3.4(a), 3.4(f), 4.1(a), 4.3, 8.4(a),[7] 8.4(c), and 8.4(d) of the Rules of Professional Conduct. The board did not find a violation of Rule 4.1(b) because in the absence of a "stay away" order, there is no evidence to suggest that respondents' client was attempting a fraud by meeting with his daughter.
Considering respondents' conduct, the board determined they violated duties owed to the legal system and the profession. Their conduct was knowing and intentional, and created the potential for serious injury. Based on the ABA's Standards for Imposing Lawyer Sanctions, the *231 board determined that the baseline sanction is disbarment.
The board agreed with the aggravating and mitigating factors found by the committee. The board noted these factors are balanced, and that there appears to be no basis in the record for a significant downward deviation from the baseline of disbarment. However, relying on the court's prior jurisprudence involving similar misconduct, the board recommended that respondents be suspended from the practice of law for two years, with all but one year and one day deferred, followed by probation and the completion of Ethics School.
One board member dissented, reasoning that the discipline recommended by the majority was too lenient.
Both respondents and the ODC filed objections to the disciplinary board's report and recommendation.[8] Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Banks, 09-1212 (La.10/2/09), 18 So.3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
After careful review of the voluminous record of this matter, we find the hearing committee's factual findings are generally supported by the record. Based on these findings, we agree that in their conduct relating to the confidentiality agreement, respondents violated Rules 3.4(a), 3.4(f), 4.1(a), 8.4(c), and 8.4(d) of the Rules of Professional Conduct. We find no misconduct relating to the drafting and execution of the affidavits.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondents' actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass'n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
Respondents, either by intent or through a high degree of negligence, had the victim sign a confidentiality agreement which could create an impression in the victim's mind that she was legally barred from discussing the meeting with her father with anyone, including Ms. Billeaud. *232 This conduct had the potential to inhibit the victim from testifying at trial and could have impeded the prosecution of the underlying criminal case.
Such conduct is serious in nature, as it has the potential to prejudice the administration of justice. Nonetheless, we decline to find, based on the facts presented in the instant record, that respondents' conduct rises to the level of witness tampering. See In re: Fabacher, 94-0731 (La.12/9/94), 646 So.2d 915 (attorney disbarred based on federal conviction for witness tampering arising from the attorney's request to a witness not to talk to federal authorities). Unlike Fabacher, nothing in the instant record indicates either respondent specifically asked the victim not to cooperate with the district attorney's office; to the contrary, the record reveals neither respondent gave any specific advice to the victim.
Perhaps the closest analogy in our jurisprudence, albeit an imperfect one, is In re: Sharp, 01-1117 (La.12/7/01), 802 So.2d 588. In Sharp, the attorney represented a client charged with carnal knowledge of a juvenile. The client advised the attorney that he had made a deal with the victim's mother to drop the charges against the client in exchange for $10,000. The attorney advised the client that this arrangement was a "bad idea" but agreed to draft an agreement to this effect. Ultimately, however, the agreement was never signed. We found the appropriate sanction for this misconduct was a suspension from the practice of law for a period of one year and one day.
Sharp is factually distinguishable from the instant case, as there is absolutely no evidence in the record before us which would suggest respondents offered any inducement to the victim. Despite this difference, however, Sharp serves to provide some guidance in fashioning an appropriate sanction. As in Sharp, respondents' actions in the case at bar carried a clear potential for harm to the criminal justice system, but that harm never materialized because the victim became aware the agreement could not serve to limit her testimony in the criminal matter.
Considering the totality of the circumstances, we believe the appropriate baseline sanction in this case is a suspension from the practice of law for a period of six months. The sole aggravating factor supported by the record is respondents' substantial experience in the practice of law. In counterbalance, there are several significant factors in mitigation: absence of a prior disciplinary record, absence of a dishonest or selfish motive, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and character or reputation. Additionally, respondents' actions caused no actual harm. These mitigating factors warrant a downward deviation from the baseline sanction.
Accordingly, we will suspend respondents from the practice of law for a period of six months, but defer the suspensions subject to respondents' successful completion of the Ethics School program sponsored by the Louisiana State Bar Association.
In reaching this conclusion, we wish to emphasize to respondents, as well as all members of the bar, that the actions taken in this case were ill-conceived and fraught with danger. While no actual harm resulted under the instant facts, any action by a lawyer which causes a witness to refrain from voluntarily giving relevant information to another party is ground for grave concern.[9] This case should serve as a *233 cautionary tale to all members of the bar and a reminder of the need to act with scrupulous adherence to the ethical rules when dealing with witnesses or unrepresented persons.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Daniel James Stanford, Louisiana Bar Roll number 22639, and John Kevin Stockstill, Louisiana Bar Roll number 23951, be and they hereby are suspended from the practice of law for six months. The suspensions shall be deferred, subject to the condition that respondents enroll in and attend one full day of Ethics School offered by the Louisiana State Bar Association's Practice Assistance and Improvement Committee. All costs and expenses in the matter are assessed against respondents in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
JOHNSON, J., dissents and assigns reasons.
CLARK, J., dissents for reasons by JOHNSON, J.
VICTORY, J., dissents and assigns reasons.
JOHNSON, J. dissents and assigns reasons.
Respondents were co-counsel for a criminal defendant charged in Lafayette Parish with two counts of aggravated rape, in which one of the victims was the defendant's sixteen-year old daughter. Initially, the victim had always cooperated with the prosecutor in handling the case; however, days before the trial, the victim met her father at respondents' office and her willingness to cooperate changed. At that time, Mr. Stockstill drafted and presented the victim with the following three documents: 1) an affidavit stating that it was the victim's desire to "talk about [the] situation" in an effort to "reconcile;" 2) an affidavit that the victim wanted to dismiss the charges against the defendant; and 3) a confidentiality agreement, which stated that all statements made during the meeting were "privileged," made "without prejudice to any party's legal position," and were "non-discoverable and inadmissible for any purpose in any legal proceeding." The agreement also provided that neither the victim nor the defendant could "be compelled to disclose or to testify in any proceedings as to information disclosed" at the meeting. Finally, the agreement stipulated that an injunction could be obtained to prevent disclosure of any confidential information in violation of the confidentiality agreement, and that breach of the agreement would expose the breaching party to liability for "costs, expenses, liabilities and fees, including attorney's fees, that may be incurred as a result of such breach." Neither Mr. Stanford nor Mr. Stockstill advised the victim that she could consult an attorney before signing the documents. Rather, Mr. Stanford asked the victim to read and sign the documents, and she did. At some point after the meeting, the victim was subpoenaed to testify at the defendant's criminal trial. However, after the meeting, she refused to cooperate with the assistant district attorney, instead, she referred the prosecution to "her" attorney, Mr. Stockstill.
Mr. Stockstill testified that the agreement was primarily intended to protect himself from an allegation by his client of ineffective assistance of counsel, as well as protect the two parties to the meeting *234 against a future civil action. Mr. Stockstill denied repeatedly that the confidential agreement intended to inhibit the victim from testifying in the criminal trial as to what her father, the defendant, told her in the meeting, as such an agreement would be unenforceable.
Based on these factual findings, the Hearing Committee determined that respondents violated Rules 3.4(a), 3.4(f), 4.1, 4.3, 8.4(a), 8.4(c), and 8.4(d), finding that respondents intended to create the impression in the victim's mind that the confidentiality agreement legally barred her from testifying in the criminal trial about a meeting with her father, and the statements made in the meeting. Respondents also caused a previously cooperative witness to become fearful and unwilling to cooperate with the prosecution, as she had previously done. The Hearing Committee determined that respondents' conduct was intentional in drafting the confidentiality agreement. The language in the agreement was put there with the specific purpose of creating in the victim's mind the illegality of telling anyone about the secret meeting and intimidating the victim from testifying to it at trial. The fact that only the affidavits were initially provided to the assistant district attorney, while the confidentiality agreement was withheld, buttresses this conclusion.
The committee likewise found the conduct of Mr. Stockstill's co-counsel, Mr. Stanford, to be intentional. Although Mr. Stanford did not draft the confidentiality agreement, he read it and notarized the document, thus, was aware of its contents. Mr. Stanford intended to prevent the victim from disclosing the fact of the meeting or its contents to the state.
The following factors largely impacted my decision: refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, and substantial experience in the law of law (Mr. Stanford was admitted in 1993 and Mr. Stockstill was admitted in 1995). In my view, respondents' conduct resulted in actual harm to the system of justice and to the victim. Hence, the appropriate discipline is suspension from the practice of law for six months.
VICTORY, J., dissenting.
I dissent from the majority opinion for many of the reasons stated in Justice Johnson's dissent and would impose a more stringent sanction against these respondents.
NOTES
[*] Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.
[1] This opinion does not use the name of the defendant in order to protect the identity of the victim. See La. R.S. 46:1844(W) (protecting the confidentiality of crime victims who are minors under the age of eighteen years and of the victims of sex offenses).
[2] It is not clear from the record whether such an order was in fact in place in this case, however, it is clear that all parties believed the "no contact" order was in place and was a condition of the defendant's bond.
[3] The formal charges also alleged violations of Rules 3.4(b) (offering a prohibited inducement to a witness) and 4.4(a) (in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person) of the Rules of Professional Conduct. However, the hearing committee concluded these rule violations were not supported by clear and convincing evidence, and in its brief to the disciplinary board, the ODC expressed its agreement with this finding. Accordingly, we will not discuss these allegations further.
[4] During her testimony, the victim's aunt disclaimed virtually any recollection of the events at issue and repeatedly referred the committee to her April 6, 2006 affidavit, which was prepared by Mr. Stockstill. Noting that the aunt had what appeared to be "a very selective memory," the committee did not find her testimony credible.
[5] The committee found the alleged violation of Rule 3.4(c) was not proven by clear and convincing evidence. The ODC objected to this finding.
[6] Some of the board's discussion of the factual findings suggests the board erroneously believed the victim had already been subpoenaed to testify at her father's trial when she met with her father at respondents' offices on October 5, 2005. However, Ms. Billeaud, the ADA prosecuting the criminal case, testified that she did not issue the subpoena until after the meeting, when the victim appeared to become uncooperative.
[7] The board's finding of a violation of Rule 8.4(a) stemmed from its determination that respondents attempted to violate Rule 3.4(c) in connection with the "no contact" waiver.
[8] Respondents also filed a motion seeking the remand of this case to the disciplinary board for reargument. Respondents asserted that after oral argument before a panel of the board, one board member recused himself, and this member was the "only member of the panel as well as the board that is a member of the criminal bar and familiar with the practices of a criminal lawyer." We see no merit to this argument. There is nothing in Supreme Court Rule XIX which requires that a member of the board be a practitioner in the area of speciality in which the formal charges arise.
[9] See Rule 3.4(f).